STATE ex rel. CAROUTHERS v. DOWDELL et ux. (No. 6572.)

(Court of Civil Appeals of Texas. Galveston. May 14, 1914. Rehearing Denied June 11, 1914.)

1. HABEAS CORPUS (§ 99*) — CUSTODY OF CHILD—RIGHT OF PARENT.

While the best interest of a child will be determinative of the question of its custody, the presumption is in favor of the surviving parent, and, in the absence of evidence showing his disqualification, he has a paramount right to the custody of his child which the courts are not at liberty to disregard.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

2. HABEAS CORPUS (§ 85*) — CUSTODY OF CHILD—QUALIFICATION OF SURVIVING PARENT.

On an application of a father for custody of his infant child on the death of his wife, as against the child's maternal grandparents, there being evidence that the father had since boyhood been a good citizen, industrious and law-abiding, that he lived with his mother, who had a small farm and was able to support the child, proof by the child's maternal aunt that the father on two occasions had been intoxicated and on one occasion had punished the child with a

switch as large as a woman's finger was insufficient to justify the court in denying him the child's custody.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 77, 78; Dec. Dig. § 85.*]

Appeal from District Court, Hardin County; L. B. Hightower, Judge.

Habeas corpus by the State, on the relation of Nathan Carouthers, against James Dowdell and wife. Judgment for defendants, and relator appeals. Reversed and rendered.

Singleton & Nall, of Kountz, for appellant. Stevens & Stevens, of Liberty, for appellees.

PLEASANTS, C. J. This is a habeas corpus proceeding instituted by appellant, Nathan Carouthers, against the appellees to recover possession of his minor child, Elvy Carouthers. The respondents, Dowdell and wife, are the father and mother of Pearl Carouthers, the deceased mother of the minor, Elvy, and wife of appellant. Mrs. Carouthers died at the home of her parents in Liberty county. She and her husband went from their home in Hardin county to visit her parents on August 10, 1912, and she was taken sick the day after they reached appellees' home and continued sick with typhoid fever until her death therefrom on November 11, 1912. During her sickness she became estranged from her husband, and on November 1st instituted a suit against him in the district court of Liberty county for divorce. Some time before the death of Mrs. Carouthers appellees made appellant leave their home, and he was not permitted to see his wife or child again. Two days before her death Mrs. Carouthers executed the following instrument:

"I am having my sister Slyvina Young to write this to let everybody know I want to give my baby Elvy to my mother this the 9th day of Nov. 1912 for I don't want Nathan to have her as he has treated her so cruel and has been the cause of my death for my throat are what is killing me.

"[Signed]　　　　　　her
　　　　　　　　Pearl X Carouthers.
　　　　　　　　　　mark.

"Witnesses: David Dowdell. Sylvina Young."

A few days after his wife's death appellant sent his father to appellees to get the child for him, and they refused to let appellant have her, and this proceeding was thereafter instituted by him for the purpose of obtaining possession of his child.

Appellant is 24 years old. He lives with his mother, who owns a place of 70 acres in Hardin county, and who, the testimony shows, is willing and able to help appellant take care of his child. He has a sister and three brothers younger than himself and all of whom live with their mother. The sister is 14 years old and will also help appellant in caring for his child. In regard to how he would take care of the child, appellant testified:

"I say that my mother can support the child. Now as to you thinking to—well, my mother can take care of it, but I am going to support it. I am just going to leave it there with my mother, and I will be staying there working there. Now as to what I meant saying that my mother can support the child and as to whether my mother is able to support the child —well, she is able to support it, but she is going to take care of it. I want to take the child with me and support it and have the right to love and educate it; that is what I want to do. I do not expect my mother to keep me and the baby there, but I am living there and working there. I want to turn the child over to my mother to take care of it for me where I can be with it."

A number of witnesses, among them being several officers and ex-officers of Hardin county who had known appellant since his boyhood, testified that he was a good citizen, industrious, temperate, and law-abiding, and that such was his reputation. He owns no property except two horses and some hogs. His occupation is that of a farmer and laborer. During his married life he lived for about six months with the appellees, and thereafter he and his wife lived on a small place belonging to his mother and near her residence. The child Elvy at the time of the trial in the court below, April 30, 1913, was 19 months old. A sister of appellant's deceased wife, who lives with the appellees, testified that she had seen appellant drinking on two occasions; her statement being as follows:

"The first time I saw Nathan Carouthers drinking was at Papa's just about a week before Christmas year before last. Nathan at that time was living at Papa's, staying there. That was the first time I ever seen him drinking. I saw him drink whisky then. He drank it on the gallery at the house. He was pretty well drunk when he got there. I don't really know what time of day it was he got to the house. The others that was there at that time was me and my mother, and father was there, and his wife. The other time I saw him drunk was when his wife was sick. That was not a year later; it was about seven or eight months I suppose; I don't really know how long it was between the times. I seen him about three or four times in that interval of eight months. I stated on my direct examination that I had been acquainted with him four or five years; these are the only times I ever saw him drinking and saw what he drank. So far as I know, those are the only two times he was ever drunk. He was not drunk enough to be down there. He was still able to navigate."

Another witness testified that on one occasion during Mrs. Carouthers' last sickness he was called upon to arrest appellant on a charge of unlawfully carrying a pistol and that at that time he smelled whisky on appellant's breath.

The sister-in-law also testified that during Mrs. Carouthers' sickness she saw appellant whip the child Elvy with a switch the size of her finger to make her stop crying. She did not testify that the child was whipped severely; her only statement being that he whipped her across the head and shoulders.

There is no evidence tending to show that appellant was ever cruel to his wife or mis-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

treated her in any way, except the allegations contained in the petition for divorce filed by Mrs. Carouthers during her last sickness, and statements made by her to her sister. Appellant objected to this evidence as hearsay, and, it being clearly inadmissible, it cannot be considered for any purpose. Appellant denied that he ever whipped his child and denied all of the allegations of the divorce petition and the statements of his wife as to his mistreatment of her.

The physician who treated Mrs. Carouthers during her last sickness testified that appellant seemed to think as much of his wife as any man could. He further testified that Mrs. Carouthers died from typhoid fever, and that:

"It is frequently the case with people in that condition that they have hallucinations and imagine things that never did happen."

There was also testimony to the effect that Mrs. Carouthers, appellant's mother, was addicted to the use of morphine. To what extent she uses it is not shown, and there is no evidence that her use of the drug has incapacitated her for the performance of her household duties or will prevent her from assisting appellant in caring for his child.

The appellees are good people and own a 50-acre farm on which they live. They are very fond of the child and are able and anxious to care for and support it.

[1] These facts did not authorize the trial court to deny appellant the right to the custody of his child. While it has been uniformly held that in cases of this kind the best interest of the child should determine the question of its custody, it is equally well settled that the presumption is in favor of the parent, and, in the absence of evidence showing the disqualification of the parent for the proper discharge of his parental duties, he has a paramount right to the custody of his child which the courts are not at liberty to disregard. State v. Deaton, 93 Tex. 243, 54 S. W. 901; Watts v. Lively, 60 S. W. 676; Parker v. Wiggins, 86 S. W. 788; Sancho v. Martin, 64 S. W. 1015; Hall v. Whipple, 145 S. W. 308.

A strict observance of this rule is essential to the welfare of society. To disregard it, or to lightly set it aside, is to invade the sacredness of that love and sense of responsibility which God has implanted in the heart of the parent for his offspring, and will necessarily tend to either destroy or weaken the love of the parent for the child or arouse in him a feeling of injustice and resentment which is likely to stifle all of his highest aspirations and to result in evil to society.

[2] Giving the evidence offered by appellees upon the question of appellant's qualification to discharge the duties of a parent its strongest probative force, it cannot be held to authorize the conclusion that he is unfit or unworthy to be trusted with the custody of his child. Whipping the child on one occasion with a switch as large as a woman's finger does not authorize the conclusion that he would be cruel or harsh in his treatment of her; there being nothing in the statement of the witness as to this whipping that indicates that the child was severely or unjustly punished. The fact that on two occasions, one of them being just before Christmas, 1911, and the other seven or eight months thereafter, he was under the influence of liquor, or, as the witness stated, "pretty well drunk," cannot in view of the testimony of witnesses who had known him intimately most of his life, to the effect that he rarely ever took a drink and was never seen by them under the influence of liquor, be held to disqualify him to have the custody of his child. The evidence upon the question of his temperance is overwhelming in his favor, and there is no evidence that he was a habitual drinker or that he was ever under the influence of liquor, except on the two occasions testified to by his wife's sister, and if her statement is true it would be wholly unreasonable to conclude that because of his having been intoxicated on these two occasions he is unfit to be trusted with the custody of his child.

To what extent his mother, to whose home he intends to take his child, is addicted to the morphine habit is not shown. Certainly there is nothing in the evidence to justify the conclusion that it has disqualified her from assisting appellant in the care of his child.

The evidence, we think, compels the conclusion that appellant is able to take care of his child and that he can be trusted with her custody. This being true, he is entitled to her custody, notwithstanding the fact that the child's grandparents are just as worthy of her custody and more able to provide for her than he. Watts v. Lively, supra.

It is unfortunate that this child cannot have the care and protection, as it has the love, of both appellees and appellant; but when the rights of the parties are put in issue, upon the evidence in this record, that of the father must prevail.

It follows from these conclusions that the judgment of the court below should be reversed, and judgment here rendered in favor of appellant, and it has been so ordered.

Reversed and rendered.