SMITH et al. v. MOORE et al.    (No. 1344.)

(Court of Civil Appeals of Texas.    Texarkana. Nov. 12, 1914.    Rehearing Denied Nov. 19, 1914.)

1. HABEAS CORPUS (§ 99*)—CUSTODY OF INFANTS—FITNESS OF PARENTS—SUFFICIENCY OF EVIDENCE.

In habeas corpus by the parents of a child born prior to their marriage to recover its custody from the father's sister, evidence *held* insufficient to support a finding that the father was not a fit person to have the custody of the child, and, on the contrary, to show that the fitness of the parents to rear the child was equal to that of the sister and her husband.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

2. HABEAS CORPUS (§ 99*)—CUSTODY OF INFANTS—GIVING PREFERENCE TO PARENTS.

Where a child born shortly before the marriage of its father and mother was given to the latter's sister to prevent the facts becoming known to other members of his family, but shortly after the marriage the parents abandoned their efforts to conceal the facts and sought to recover the custody of the child, and their fitness to rear it was fully equal to that of the sister and her husband, the father being better able financially to support the child than the sister's husband, the court in habeas corpus erred in awarding the custody to the sister, since, while the welfare of the child will be considered in disposing of its custody, where other things are equal, the natural parents, though they have voluntarily parted with the child, should be given its custody.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

3. HABEAS CORPUS (§ 99*)—CUSTODY OF INFANTS—SUFFICIENCY OF EVIDENCE.

In habeas corpus by the parents of a child born out of wedlock to recover its custody from the father's sister to whom the parents had delivered it for the purpose of concealing the facts from other members of the father's family, and with the intention of selling out and moving to some part of the country where its illegitimacy would not be known, evidence *held* insufficient to support a finding that the child was virtually abandoned by its parents when turned over to the sister and her husband.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

Appeal from District Court, Harrison County.

Habeas corpus by Mary Smith and husband against Nora Moore and husband. From a judgment in favor of defendants, complainants appeal. Reversed and rendered.

Lane & Lane, of Marshall, and W. B. Skinner, of Mt. Vernon, Mo., for appellants. Beard & Davidson, of Marshall, for appellees.

HODGES, J.    On October 18, 1913, Knowles and Mary Smith, husband and wife, instituted this suit by writ of habeas corpus against Herman and Nora Moore to recover the custody of Herman Smith, an infant then a little more than 15 months of age. The facts show that Herman Smith is the child of Knowles and Mary Smith, but was born out of wedlock. At the time of its birth the father and mother were engaged to marry each other, and did marry about a month later,

and have lived together as husband and wife continuously since that time. The birth of the child occurred on June 30, 1912, at the home of Mrs. Smith's sister in Missouri, about 30 miles from Mt. Vernon, near which place resided the parents and other relatives of Knowles Smith, and where he had previously made his home. The sister mentioned above kept the child about a week, and, being unwilling to keep it longer, so notified its mother. It was then carried by the latter to her mother in Kansas, where it was kept about another week. The mother of Mrs. Smith, being old and infirm, declined to keep it longer, on account of her physical condition, and the child was again taken possession of by its own mother. On August 17, 1912, after the complainants were married, Smith wrote the following letter to Mrs. Nora Moore, his sister and one of the appellees herein, who was at that time residing at Marshall, Tex., asking her to take the child:

"Mt. Vernon, Mo., Aug. 17, 1912.

"My Dear Sister Nora: I am going to write you Nora, asking a great favor of you, something that almost kills me to ask of you, but believe that you will help me for a while at least. Now Nora listen you know I am married to M., and all with my own free will, and Mary had a baby boy before we were married, and Nora this baby is in Kansas now. I have never seen it only when it was born, and Mary and the doctor tell me it is allright and a well baby boy, and I have heard you say you wish you had one, and I have got to do something soon and very soon, and Nora I don't feel like I could bring it here now for a while at least and disgrace my poor old mother and all the rest. If some one will keep him until I sell out or get shed of what I have then I could leave here and stay away. Now Nora, if you will help me for six months or if you will take him for a while and learn to love him you may keep him as long as you live and then I will see to him or if you will help me out for a while I will reward you for what you have done. My folks here need never know where you got him Nora. I won't feel hurt at you in the least if you don't do anything, but please help me if you feel like you can. Talk to Herman about this and see if he is will to help me out, if he isn't I wouldn't want you to take him. I will be to all expenses for the child. Now answer me as soon as possible for I must do something at once and if you will help us Mary will come and bring him soon and if you want to meet her at the depot she could turn right around and come home and if you should meet her on the way I will settle for your fare. Help is what I want Nora. I believe that it has a good mother. You know we are all likely to be misled. Now I will appreciate anything you can do, and if you cannot do anything I am not sore at you. I ask you to never mention this to any one but Mary and me would no where it was if you had him Nora. If you should take him for a while and get sick she will come and wait on you. Answer as soon as possible.

"Your brother,    Knowles."

Mrs. Moore and her husband replied to this letter consenting to receive and take the child into their home, and by arrangement met Mrs. Smith in Texarkana, where the child was delivered to them. The testimony shows that the babe was then in a very emaciated

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

condition, and there appeared to be little hope that it would live; but by careful nursing and prompt medical attention it soon gained strength and developed into a healthy child, and Mr. and Mrs. Moore became exceedingly fond of it.

After their marriage the complainants moved to a farm belonging to Smith near Mt. Vernon, Mo., where they have since resided. The record shows that during the next two months there was some correspondence between the parties regarding the condition and welfare of the baby. This correspondence discloses strong parental affection and a longing on the part of the mother to have the child with her. It was finally arranged that Mr. and Mrs. Moore should visit Mrs. Moore's relatives in Missouri and take the child with them. This they did about June, 1913. When complainants saw their child, they requested that they be allowed to keep it, and that Mr. and Mrs. Moore surrender whatever claim they had to it. Mrs. Moore declined, claiming that the complainants had agreed when she took charge of the child that she might keep it permanently in the event she learned to love it. It appears that an altercation followed between Mrs. Moore and Knowles Smith, in which the latter used some violence towards his sister. The witnesses differ as to just what took place at the time, but it is admitted that Mr. and Mrs. Moore finally agreed to surrender the custody of the child if they were permitted to take it back to their home in Texas and explain to their friends why they did not keep it. There was testimony showing that this course was the result of a family conference participated in by the father and mother of Mrs. Moore and Smith and one of their sisters. Moore and wife, however, testified that they gave their consent under coercion; that at the time they had no intention of keeping the promise to send the child back, but had agreed to do so through fear of Smith because of threats of personal violence made by him. Upon the arrival of Mr. and Mrs. Moore at their home, the latter wrote the following letter:

"Marshall, Texas, June 16, 1913.

"Knowles and Mary: We arrived in home yesterday at three o'clock everything here looked good to us, had a very hard trip home, little Herman was sick all the way with a hot fever. Every one on the train was nice to us. He is much better to-day, meant to have the Dr. this morn, but don't think he needs him, gave him a dose of castor oil last night. Well every one was glad to see us home again and say don't know how we will get along without the boy, he was so glad to get home, he knew just as well as we did he was home, has been so sweet and good ever since we came. Herman was sick last night, didn't go to work this morning. Knowles I do sincerely hope you and Mary are feeling better than when we were there, I am not sorry now I came home for it would have had to be settled some time, but now I feel like I have done all that I can do and when you all feel like you can do without him no longer, you and Mary come and make us a visit and we will make it as pleasant for you as we can and have no hard feelings towards each other."

About a month later she wrote another letter to her brother, positively declining to surrender the child, saying that she had consulted a lawyer since reaching home and was advised that she could not legally be deprived of the child's custody. This letter also conveyed the information that after returning to Marshall they had adopted the child. It further referred to a balance of $115 due them for money which they had expended for the benefit of the child. It appears that Smith had agreed some time previous to reimburse them for such items, but had theretofore sent only $35. Smith subsequently through an agent made formal demand for the child, and at the same time tendered this balance. Both the request for the child and the tender of the money were refused, and this suit followed. After a full hearing, the court below refused the prayer of Smith and wife, and directed that the child remain in the custody of the appellees.

[1] The court filed his findings of fact, in which he embodied, in substance, those which have been stated. He found in addition, however, that Mary Smith, the mother, had declined to further care for her child when it was delivered to the defendants at Texarkana, and that this virtually amounted to an abandonment on her part and that of her husband; that Moore and wife took the child with the understanding that if they learned to love it it was to be theirs for all time. He concluded as a matter of law that the best interests of the child—moral, physical, and from an educational standpoint—demanded that it remain in the custody of foster parents. Complainants' counsel requested the court to make further findings of fact, and to that end propounded a series of questions, which were answered. The last probably furnishes the true reason for the judgment rendered, and is as follows:

"The court is of the opinion that Mary Smith would be a proper party to have charge of this child, so far as her part of such an undertaking would be concerned—at least so if not under the influence of her husband. But the conduct of Knowles Smith in this whole matter has been of such a character that the court is of the opinion that the welfare and best interests of the little boy asked for by the plaintiffs demand that he be not placed in the custody of Knowles Smith and his wife, Mary Smith, but in the care and custody of Nora and Herman Moore, and it is so ordered."

The testimony is uncontradicted that Knowles Smith is a young man between 30 and 40 years of age and bears an excellent reputation in the community where he resides. He is a farmer and a deputy sheriff, owns his own home, consisting of about 80 acres of land and worth between $4,000 and $5,000. He also owns the necessary stock, farm supplies, and implements required to operate a plantation of that size. His income is said to be about $100 per month. There is nothing whatever in the record to question his fitness in any respect to have the custody of the child, unless it be certain transactions

to which Mrs. Moore testified. She stated that during her visit to Missouri in June, 1913, Smith became angered with her because of her refusal to part with the child, and struck her in the mouth with his fist, knocking her down, after which he choked her. Her father and sister, who were present at the time, deny that violence to that extent was used, and give a different account of the affair. They say that Smith became angered with his sister because of her conduct in failing to burn some letters which he had written her; that her manner was such as to irritate him; and that he struck her on the mouth with two of his fingers. They deny that he knocked her down or choked her. According to their version, she was the aggressor. Mrs. Moore admits that both her father and sister are good people and bear good reputations. These two witnesses are corroborated by Smith himself and his wife. Mrs. Moore further testified that about three years prior to the trial her brother told her that on one occasion he had taken his father by the collar and threatened to kill him. These were the only circumstances, aside from the unfortunate transaction preceding the birth of the child, which in any way reflected upon the fitness of either Smith or his wife to have its custody. Mrs. Moore admitted that Smith was "all right when unmolested." She doubtless meant that he was a good man when not angered or aroused by some cause. The testimony shows that Mr. and Mrs. Moore are both good people and bear excellent reputations in their community. They have been married a number of years, and have no children of their own. They own property estimated at about $2,000 in value. Mr. Moore is employed in the railway shops at Marshall, Tex., as a carpenter, and earns a monthly salary of from $70 to $85.

[2] Taking the evidence in its entirety, the fitness of the complainants to rear the child is fully equal to that of the respondents; in fact, in some respects better, if we compare their financial conditions. Under these facts, we think the court erred in not awarding them the custody of their child.

We are referred to the following Texas cases as supporting the judgment rendered in the court below: Legate v. Legate, 87 Tex. 252, 28 S. W. 281; Peese v. Gellerman, 51 Tex. Civ. App. 39, 110 S. W. 197; Plahn v. Dribred, 36 Tex. Civ. App. 600, 83 S. W. 867; Pittman v. Byars, 45 Tex. Civ. App. 46, 99 S. W. 1033; Schneider v. Schwabe, 143 S. W. 265; Ball v. Smith, 156 S. W. 576. These have all been carefully examined, and we do not think they warrant the judgment rendered.

In Peese v. Gellerman, Plahn v. Dribred, and Ball v. Smith, the mothers of the children had died, and their fathers were making applications for custody after second marriages. In each instance the court found as a fact, upon evidence the sufficiency of which was not questioned, that the moral surroundings of the child in the home of the parent, either on account of the character and reputation of the father or of the stepmother, would not be good.

In Pittman v. Byars the court does not state the facts with sufficient fulness to enable us to determine just what was the controlling reason.

In Schneider v. Schwabe the mother had married a second time, and sought the custody of her two children after several years of separation only as a pretext, so the court found, for securing the control of a small amount of money belonging to them. It was further shown in that case that the mother had married a second husband, and a large family of children had accumulated, and the income of the husband was inadequate for their proper maintenance and education. The court concluded that the children in question would probably be neglected if given into the charge of the mother and stepfather.

The Legate Case was presented on certified questions, and among those propounded was the following:

"Where the father and mother have, by written agreement, fully and finally relinquished their right to the custody of their infant daughter, three months old in favor of another, at a time when the mother was unable to give proper attention to the child on account of illness from which she was expected to die; and the child has been formally adopted by the person to whom such custody was given; and where, on habeas corpus trial, it is shown that the person having custody of the child is in every respect qualified to care for the child and provide for it; and it is also shown that the father and mother are also qualified in every way to care for and raise the child—should the child, after it has been cared for tenderly and lovingly for nearly two years by its foster parents, be taken from their custody and given over to 'the custody of the natural father and mother?"

After holding that the custody of a child is not legally a subject-matter of contract, and that the state, though recognizing the parents' natural right to its custody, has the superior right to determine where the child shall be placed, Judge Denman, who rendered the opinion, said that such matters were to be determined by the trial court upon the issues of fact in each particular case. He says:

"Ordinarily the law presumes that the best interests of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another. Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of habeas corpus, such parent is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily brought about, and the court will not grant the relief, unless upon a hearing of all the facts it is of opinion that the best interests of the child would be promoted thereby."

The facts of that case, as stated in the opinion of the Court of Civil Appeals, which is reported in 29 S. W. 212, show that the child in controversy was the infant of parents who were very poor; that the mother at the time she parted with its custody was in a bad state of health and was not expected to live. Her health to some extent was subsequently restored, but still remained delicate, and she was unable to perform all of the duties that would be required of her in the care and attention of the child in connection with her other domestic duties. The foster parents of the child, on the contrary, were shown to be people of excellent moral and social standing, and were well able to give the child many advantages which it could not obtain if placed in the custody of its parents. Judge Finley, among other things, said this in referring to Mr. and Mrs. Wheeler, the natural parents:

"But, owing to their strained financial circumstances, the nature of Mr. Wheeler's employment, and the condition of Mrs. Wheeler's health, these opportunities and advantages will necessarily be limited, and her life will be to some extent one of privation and toil; and, unless Mrs. Wheeler is relieved to some extent of the burden of household labors and cares that are already too heavy for her weak condition, * * * the child will, in all probability, within a few years, be without the constant personal parent's care that she will with reasonable certainty receive until her maturity in the home of the Legates."

It will be observed that there the ability of the parents to provide for the welfare of the child was called in question and furnished the chief reason for refusing them its custody.

The last expression of our Supreme Court to which our attention has been called is found in State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S. W. 901. In that case a mother had parted with her child soon after the death of her husband, solely on the ground of her inability to provide for it. She subsequently married, however, and then sought to recover possession of her child. The testimony showed that the foster parents took the child with the understanding that they were to keep it, and they had retained its custody for several years; that they were people of exemplary habits and were well able to care for and educate the child and to give it such advantages as its social condition demanded. It was also shown that the mother and stepfather of the child were people of good reputation and standing, and were also willing and able to give the child all needed advantages. The facts presented a case in which there was probably an equality of fitness in the contending parties to discharge all the duties required for the welfare of the child. The question then was: To whom should the court, in the exercise of its discretion, award the custody? The district court refused the prayer of the natural parents and awarded the child to the foster parents. This judgment was affirmed by the Court of Civil Appeals. The Supreme Court, however, reversed and rendered judgment directing that the child be delivered to its mother. In the course of the opinion, which was rendered by Justice Brown, the Legate Case is referred to and discussed. While not overruling that opinion, it is said that a careful examination will show that it was not there intended to justify the holding of the trial court in the case then being considered. Justice Brown then quotes at some length from State v. Richardson, 40 N. H. 275, which we think lays down the principle that should govern in this case. He announces the conclusion that where all things are equal, although the natural parent had voluntarily parted with her child, she should be given its custody.

[3] In legal effect the facts in this case are much like those in State ex rel. Wood v. Deaton. The finding of the court that Smith was an unfit person is not only unsupported, but is opposed to the undisputed evidence. Neither is the finding that the child had been virtually abandoned by its parents when turned over to Moore and wife at Texarkana supported by the record. The evidence does show that soon after its birth the complainants endeavored to conceal that fact from Smith's family, and it was for that purpose only that they called upon Mr. and Mrs. Moore to take charge of the child. It is undisputed that Smith had determined to sell out his property in Missouri and take his wife to some distant country where the illegitimacy of the child would not be known, but that he failed to find a purchaser and finally concluded to remain at his old home. It is also shown that his relatives soon became aware of the birth of the child, and there appeared to be no further effort to conceal it. According to Moore's testimony, he and his wife took the baby reluctantly and told the mother at the time that she could have it back if she called for it within six months. According to the testimony of Mrs. Smith, she did not intend to part with her child for all time; she regarded its custody by Mr. and Mrs. Moore as only temporary, and was looking forward to the time when she and her husband would move to some other country and take the child with them. In saying that the welfare of the child will be consulted in disposing of its custody, the courts do not mean that no consideration whatever will be given to the claims of the parents. The attachment of foster parents is based almost entirely upon association; that of the natural parents upon a God-given instinct. Parental affection, which finds its chief reward in the care and society of the offspring, has some claim on the conscience of courts.

The judgment of the district court is therefore reversed, and judgment here rendered awarding the custody of the child to the appellants.