**GARNER v. BOWLES et al. (No. 9618.)**

(Court of Civil Appeals of Texas. Fort Worth.
April 23, 1921. Rehearing Denied
May 21, 1921.)

**I. Habeas corpus ⬤⟲99(3)—Custody of children determined by their welfare.**

The custody of infant children as between their father and their maternal grandmother and aunt, in whose possession the father had placed the children on the death of the children's mother, will be determined according to the best interests and welfare of the children.

**2. Habeas corpus ⬤⟲85(1)—Facts to be proved to deprive parent of custody of child as against other person to whom child has been committed.**

It is not sufficient, to deprive a natural parent of the custody of his child, to merely show that he has promised to give its custody to another, or that he has been guilty of some act or conduct justifying criticism, or that the interests of the child will be as well served by leaving it in the custody of its grandparents or other person to whom it has been committed, but the proof must go further and show the unfitness of the parent as a whole, or his inability to serve the best interests of the child.

**3. Habeas corpus ⬤⟲99(4)—Father who is a fit person to care for children and is able financially will be given custody.**

Where father was better able financially to support infant children than their maternal

grandmother and aunt, into whose possession the father had placed the children on the death of their mother, and where both the father and his second wife were intellectually and morally proper persons to exercise parental duties toward the children, and where the grandmother was 70 years of age and the aunt was working, the court will give the father possession of the children.

Appeal from District Court, of Montague County; C. R. Pearman, Judge.

Application for writ of habeas corpus by R. A. Garner against Mrs. A. R. Bowles and another. Judgment for defendants, and relator appeals. Reversed and rendered.

Homer B. Latham, of Bowie, and W. O. Davis, of Gainesville, for appellant.

Donald & Donald, and Benson & Benson, all of Bowie, for appellees.

CONNER, C. J. This proceeding was instituted by R. A. Garner, a resident of the state of Oklahoma, in the district court of Montague county, by an application for a writ of habeas corpus to recover from Mrs. A. R. Bowles and Miss Helia Bowles the custody of his two minor children, Rebecca May and Samuel E. Garner, 9 and 3 years of age, respectively. The writ of habeas corpus was issued as prayed for, upon the return of which a hearing was duly had on June 17, 1920. The court, after having heard the evidence, refused the prayer of the relator, and remanded the custody of the children to the respondents, and the relator has duly appealed.

The only assignments of error presented by appellant are assignments which question the sufficiency of the evidence to sustain the court's judgment. The evidence has been carefully considered, but there is little, if any, conflict in the material facts. Appellant's first wife was Rexie Bowles, a daughter of appellee Mrs. A. R. Bowles and a sister of appellee Helia Bowles. After the marriage, for some time appellant and his wife lived with appellees at the home of Mrs. A. R. Bowles. Appellant was engaged in ordinary labor, at a salary from $50 to $70 per month, he contributing to the support of his family. To this marriage were born three children, to wit, Richard A., already in appellant's custody, and Rebecca May, and Samuel E. Rexie Bowles Garner died March 25, 1918, leaving surviving her appellant and the said children. At the time Rebecca May was 6 years of age and Samuel E. was 9 months of age. The evidence tends to show that appellant was then unable to properly care for his children, and in order to have this done they were committed to appellee Mrs. A. R. Bowles, with the statement by appellant that she might keep them as long as she lived. Appellant thereafter removed to Wichita

Falls, Tex., where he was in the employ of one or more parties, and later removed to Oklahoma, where he, together with another party, engaged in business, in which he has accumulated a net interest of $16,000. Some 9 months after the death of his first wife, appellant married again. His present wife at the time of the marriage was 19 years of age, at the date of the trial 23. She has never had any children of her own but was the oldest of a family of eight children, and assisted in caring for them. Witnesses who knew her testified that she was of good disposition, and gave no account of her life or actions to her discredit. On one or more occasions the little children in controversy visited appellant and his present wife, and witnesses who observed her demeanor testified that she treated them kindly. Mrs. Garner herself testified, among other things, that:

"I desire to take care of these three children of Mr. Garner, and have been willing to do so since I married him. I contemplated doing this at the time I married, and expected to do so. I will treat them as near like a mother as I can. I did not treat the little girl in a cruel manner when she visited us, and did not chastise her, but did speak to her, but not harshly. I would expect them to obey me, if we are given the custody of the children. I am physically able to take care of and look after these children and do the additional work, and I am willing. I worked about 4 years before I married, as I had to make my living."

On the other hand, Mrs. Bowles testified that at the time of the trial she was 63 years of age, was in good health, and she owned her own home, a cow, chickens, and garden; that appellee, her daughter, Helia Bowles, lived with her, and earned $70 per month, which with the aid of the cow, chickens, and garden enabled them to live comfortably; that she felt able to support the children without the aid of their father; that she was unable to state the exact amount the father of the children had contributed to the support of the children while she had them. She further testified:

"I suppose he done the best he could. Mr. Garner and my daughter came to my house before the little girl was born, and stayed until she was 2 years old. He did not pay any house rent. His wife and all were there for 17 months, but what he actually spent I do not remember. Mr. Garner gave as his reason for wanting the children was that his wife was making him do it, forcing him to do it, and she was making him live in hell. [This Mr. Garner denied.] The little girl and her brother have visited Mr. Garner in his home. They stayed two or three days and came back with never a thing washed. * * * When the little girl was sick I called Doctor Wilson, as I get excitable over the children when they get sick. I called her father, and he said he wouldn't come unless something serious happens, and he never called up and asked me how the child was; he never came at all. My daughter, Doctor

Wilson, and I waited on the child for six months, just nothing but skin and bones. * * * Helia and I are in a position to care for the children. We are all members of the church. The little girl is in the third grade at school, and has never been kept out of school and never was tardy. I desire to keep these children because of the relationship. I would give my life for them. I have stayed right at home with them all the time. I never go to the picture show and leave them. I wouldn't leave them to go to the nearest neighbor's house. * * * I have raised five children of my own in Bowie, and am as well qualified to raise them as my own."

Further testimony was to the effect that in addition to the two children now with her she is rearing another grandchild; that her daughter Helia lives with her and contributes to her support. Appellee Helia Bowles testified that she had worked for the telephone company off and on for some 8 years, and contributed to the support of the children, and was able to provide for them in connection with her mother's help; that while Mr. Garner lived in their home from February, 1911, to June, 1913, some 28 months, that she paid half the expenses incurred, and Mr. Garner contributed approximately $25 per month; that she received from Mr. Garner $150, for which she offered to give her note, but that he would not let her do so, stating that it was a Christmas present; that she loved the children better than herself; that from February, 1915, to June, 1916, he gave Mrs. Garner $77, and $20 after that, and later he sent $15, $112, in all; that he was with the telephone company at the time, making $55 a month. The family consisted of Garner, his wife, and the little girl, in 1911. She further testified:

"I should think Mr. Garner has contributed as much as $900 in 2 years and 3 months; about $25 a month. He has sent $25 a month since last fall; before that he wouldn't send more than $12.50 sometimes, sometimes more. I could have supported the children without it. He gave me $25 in cash when I started on a trip to Arkansas; I had forgotten that. He gave the children a little which I put in a savings bank; I have it in the bank for them, $30."

Other witnesses testified to an acquaintance with Mrs. Bowles and Miss Helia, and stated that they were members of the church, of good character, and that in their opinion the home life of Mrs. Bowles was conducive to the welfare of the children she was raising.

Under this statement of the facts, in our judgment, the court should have granted the prayer of appellant, and awarded to him the custody of his children.

[1] In all such cases the essential fact to be determined is what is to the best interest and welfare of the children, and in the case of State v. Deaton, 93 Tex. 243, 54 S. W. 901,

in an opinion by Mr. Justice Brown, then associate justice, it is said that burden of proving that the best interests of a child will be subserved thereby is not upon the parent seeking to recover its custody but, upon the party denying such restoration of the child to the charge of its parent, in the case before us, the testimony, as we read it, furnishes no ground for a criticism of appellant, unless it can be said that his failure to visit Mrs. Bowles during the sickness of the little girl indicated a want of affection on his part. Mrs. Bowles herself testified, however, that he said he would come if it was serious, and she does not testify that then or at any time thereafter she notified appellant that the little girl's sickness was serious. The evidence tends to show that at the time he was working at a distant point for monthly wages, and unless he was apprised of serious sickness on the part of the child it may be well supposed that he could trust Mrs. Bowles to lovingly look after it. Other than this circumstance, neither of the appellees testified to any occasion when appellant was unkind or inattentive to either his deceased wife or the children, nor does the evidence otherwise indicate any want of that natural affection that a father has for his offspring. In the case cited, State v. Deaton, it was there made clearly to appear that the child involved in that controversy had been committed by the mother to a distant relation with a promise that it might be kept as their own, and that such relation was in all respects worthy and able to care for the child. The Supreme Court nevertheless held that the trial court should have awarded the custody of the child to its mother. In this connection the court said:

"God, in his wisdom, has placed upon the father and mother the obligation to nurture, educate, protect, and guide their offspring, and has qualified them to discharge those important duties by writing in their hearts sentiments of affection and establishing between them and their children ties which cannot exist between the children and any other persons. Especially is this the case with the mother. Parents cannot divest themselves of the obligation imposed upon them by their Creator, but when they become disqualified for a proper discharge of such duties, civil government has the right, in the interest of the child, to provide for its proper nurture and education.

"When the parent has parted with the possession and control of his or her child and seeks to regain that possession through the courts, it becomes the duty of the court, in a proper case, to protect the child against the evil results that may flow to it from an improper direction through incompetent or disqualified parents. The rule which should guide the court is aptly expressed in the case of Weir v. Marley, which we have quoted, and is supported by the case of State v. Richardson, 40 New Hampshire, 275, in this language: 'The discretion to be exercised is not an arbitrary one, but, in the absence of any positive disqualification of the father for the proper discharge of his parental duties, he has, as it seems to us, a paramount right to the custody of his infant child, which no court is at liberty to disregard. And while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided, until it is made plainly to appear that the father is no longer worthy of the trust. The breaking of the ties which bind the father and the child can never be justified without the most solid and substantial reasons. Upon the father, the child must mainly depend for support, education, and advancement in life, and as security for this he has the obligation of law, as well as the promptings of that parental affection, which rarely fail to bring into the service of the child the best energies and the most thoughtful care of the father. In any form of proceeding, the sundering of these ties will always be approached by the courts with great caution, and with a deep sense of responsibility. The rule laid down is sustained by the authorities, of which we cite the following: Richards v. Collins, 45 N. J. Eq. 286; Miller v. Wallace, 76 Ga. 479; State v. Banks, 25 Ind. 500; Rust v. Vanvacter, 9 West Va. 612; State v. Libbey, 44 N. H. 324; Moore v. Christain, 56 Miss. 408; 31 Am. Rep. 375; Chapsky v. Wood, 26 Kan. 653; In the Matter of Bernice S. Scarritt, 76 Mo. 577."

[2] In the case of State v. Dowdell, 168 S. W. 2, by the Galveston Court of Civil Appeals, in which a writ of error was refused, is was held that on an application of a father for the custody of his infant child on the death of his wife, as against the child's maternal grandparents, that proof by the child's maternal aunt that the father on two occasions had been intoxicated and on one occasion had punished the child with a switch as large as a woman's finger was insufficient to justify the court in denying him the child's custody. See, also, Smith v. Moore, 171 S. W. 823; Carter v. Lambert, 214 S. W. 566; Cardenas v. Barrera, 216 S. W. 474; Dunn v. Jackson, 212 S. W. 959. An examination of these cases will disclose a steady adherence to the principles annunciated by the Supreme Court in the case of State v. Deaton, supra, and the three cases last cited will illustrate the conclusion of the courts that it is not sufficient to deprive the natural parent of the custody of his child to merely show that he has promised to give its custody to another, or that he has been guilty of some act or conduct justifying criticism, or that the interest of the child will be as well served by leaving it in the custody of its grandparents, or other person to whom it has been committed. The proof must go further, and show the unfitness of the parent as a whole, or his inability to meet and fulfill the ultimate purpose of the law, to wit, to serve the best interests of the child.

[3] In the light of these authorities, as solemn as may be the determination, we feel unwilling to approve the judgment of the trial court. It is doubtless true that appellees would love and care for the children in question as best they could, but they certainly are not financially as able to do so as the father, and there is no testimony worthy of serious consideration which will justify the conclusion that either appellant or his present wife is intellectually or morally an improper person to exercise all of these duties which by nature is placed on the father, and which by obligation and love for the father, as we must assume, rests upon the stepmother. Or should it later be made to so appear, the courts, in the interest of the children, have yet the power to commit their custody to other proper persons. Appellee Mrs. A. R. Bowles has nearly lived the alloted period of three score and ten years, and has arrived at that age of life when we are apt to be overindulgent, particularly to our grandchildren. The course of life makes it certain that the allwise One has committed to youth the responsibility and joy of giving birth to and rearing children. It is during this period of life that it may be well supposed that they have more of that vigor necessary to restrain and correct infantile delinquencies, and less of that harmful indulgence that is natural during our closing years, and it certainly cannot be said that the natural instinct placed in the breast of man to love and care for his children is less than the natural love and instinct of the grandparent. So that, however worthy Mrs. Bowles may be, and however able during the remaining period of her life to care for appellant's children, we think they should be committed to appellant as his right, and as being equally able to serve their best interests. We think this is particularly true in that by the judgment below appellant was awarded the custody of his oldest boy, and it can but be the desire of a father's heart that his children shall grow up together and love one another as brothers and sisters, a result for their sake also to be desired, and not so probable if they are separated.

Certain testimony introduced suggests a possible personal estrangement between appellant on the one side and the grandmother of the children on the other. If such estrangement there be, the children are in no manner responsible therefor, and should not be visited with any injurious consequences from it. It cannot be doubted that it would be to the interest of the children to be allowed to associate and visit with their grandmother and aunt upon reasonable occasions and under reasonable conditions, and that to take the children from them and place them in a home with a stranger will be inexpressibly

sad to them for a season, to say the least. It will be equally grievous to appellees, for God has likewise planted in their hearts a self-sacrificing love for those children almost, if not fully, equal to that of the father. While we have deemed it our duty under the law to decide this case in favor of appellant, we think it not amiss to suggest that the love and affection cherished by the appellees and the tender care they have taken of the children in their tender years when appellant had no place else to put them should appeal strongly .to the manly nature of a loving father, and cause him to forget any possible offense by the grandmother which grew out of her jealous love for his offsprings. We therefore venture to express the hope that all bitterness or ill feeling, if any, engendered by the unfortunate circumstances of this case, may be forgotten by all parties, to the end that the little children may have the pleasure and benefit of free intercourse and associaton at all proper times with their grandmother and other maternal relatives.

We conclude that the judgment of the court below must be reversed, and here rendered in appellant's favor, awarding him the custody of all of his children. It is further ordered, however, that all costs of the suit, both here and below, be taxed against appellant.