**ELLIS v. STUCKEY et al. (No. 10929.)**

(Court of Civil Appeals of Texas. Fort Worth. March 1, 1924.)

**Parent and child** ⚫➡2(4)—**Order denying custody of child to father and awarding it to maternal grandfather held error.**

Order of trial court, denying relator custody of his minor daughter, and awarding it to her maternal grandfather, *held* error on evidence that relator was in no way disqualified to have such custody, but was in every respect the proper guardian of the minor's person.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Habeas corpus by D. I. Ellis against W. F. Stuckey and others. From the judgment rendered, relator, D. I. Ellis, appeals. Reversed, and judgment rendered for relator. Certified, with instructions.

Talyor & Taylor, of Wichita Falls, and H. M. Muse, of Henrietta, for appellant.

Frank Holaday, of Henrietta, for appellees.

DUNKLIN, J. D. I. Ellis has appealed from an order of the judge of the Eighty-Ninth judicial district court of Wichita county awarding the custody of his daughter, Modern Priscilla Ellis, five years of age, to W. F. Stuckey.

The suit was a habeas corpus proceeding instituted by Ellis against Mrs. Bennie Robinson and her father, W. F. Stuckey, for the custody of the child.

D. I. Ellis and Mrs. Bennie Robinson were formerly husband and wife, and the child was the fruit of that marriage. The marriage relation was dissolved by divorce proceedings, and after the divorce the former wife of Ellis was married to W. J. Robinson. Ellis was married again, and he is now living with that wife in his home in Wichita Falls. After the marriage of Ellis and his former wife was dissolved by the decree of divorce, the parties thereto entered into an agreement whereby each was to have custody of the child for six months of each year. Thereafter a controversy arose between them which resulted in a proceeding in court, and the district judge awarded the custody of the child to W. F. Stuckey, her maternal grandfather. Stuckey lived on a rented farm near Gordonville with his two daughters, one the former Mrs. D. I. Ellis, and another daughter, referred to by her father as Gyp, who had also been divorced from her husband and had two children. Both of those daughters worked as waitresses in a café, and were absent from their father's home a good deal of the time. The proof showed that by reason of their conduct there had been considerable talk about their characters in the neighborhood in which they lived; that they had assaulted a man, and, according to a letter from the former Mrs. Ellis, which was introduced in evidence, had given "him a good whipping," after which "he looked like a butchered hog," and the assailants had paid a fine for that assult. The proof further showed that before the former Mrs. Ellis married W. J. Robinson she procured from him money in the aggregate sum of $1,800, and Robinson testified in part as follows:

"I am the husband of Bennie, the mother of the child in question. We were married some months ago. I have never lived with her since our marriage. I now have a divorce suit pending which will be tried soon, and I am alleging that she and her father and others have extorted money through fraud. They are some set of characters. There are other grounds—numerous ones, yes, sir. I have been in their home in Gordonville several times before I married, yes, sir; the house at that time was not furnished hardly at all. One time before I was married to the character I arrived there just as they were getting up, and they were all sleeping on the floor. I returned after that, and that was after I had been furnishing money to them for quite a while, and the house was better furnished. They had purchased beds and other furniture."

Stuckey testified in part as follows:

"Yes, sir, my daughter Gyp had been married, has two children, and has been separated from her husband quite a while. She was divorced. She is a waitress in a café. That is the business that both of them have followed. I do not know about their surroundings when away from home. Yes, sir, Mr. Robinson came there with an officer. It had something to do with the money he had been sending my daughter. Yes, there was talk in the community about that. It is a fact that we have had more or less trouble in our family during all of the time that we have lived in Gordonville. Yes, sir, people around there know about these various affairs. Yes, sir, we have had a great deal of trouble with our girls. No, sir, I cannot say that we have made a success of raising our two daughters, but I still say that we raise this little girl. Yes, sir, in the face of what I have testified to. I do tell the court that the surroundings and environments are such that we can raise this little girl as she should be raised. Yes, sir, I did say that I have not been successful in raising my daughters, and I repeat that. I make the best living for my family that I can. My daughters help some. My son helps me some. I did not have a gun on when I came after the child this time. I went into Mr. Ellis' place of business and took the child. I do not recall having told him that I would return the child the next morning. I didn't know that my daughter had turned the child over to him. I do not know what her agreement was, but she could make no agreement. I had this child and what I said went. Yes, sir, as long as this child is at my home she will be subject to the influences of my two daughters. * * * My daughter is at home sick. She could not be present today. No, sir, she does not look after the child except when she is at home. * * * Yes, sir, my daughters are intending to leave home soon, so the child

could not be under their influence. They are going to California; I think that is their intention now."

W. F. Stuckey made many contradictory statements on the witness stand, saying that on a former occasion he had testified that he owned his home, but was mistaken in that testimony, that his son and daughter owned the home in which they lived, and later saying that he lived on a rented farm of 100 acres of land, on which he made a support for his family. He further testified that the only crops grown on that land for two years had been feed crops. Another contradiction in his testimony consisted in a statement that he had never known of his daughter reciving any money from Robinson, and another statement in the further course of his examination as a witness to the effect that he knew of such contributions at the time they were made. He admitted that one of his sons had been killed by the father of a girl, and for that killing no indictment was found. He failed to point out any property which he owned, although in a general way he felt that he was able to support the child in controversy, and his wife testified practically to the same effect.

Mrs. Robinson, the mother of the child, did not testify on the trial, and her father in his direct examination testified that she was not at home, but later contradicted that by saying she was at home but unable to attend court by reason of illness, as shown above. Stuckey's daughter Gyp did not testify, and no reason was given why she was not used as a witness. J. M. Motes and wife, Mrs. Della Motes, both testified that, while Stuckey's two daughters were serving as waitresses in a café owned by the two witnesses, Mr. Stuckey came into their place of business on two occasions while drunk and acted in a disorderly manner, and Mrs. Motes further testified that on one of those occasions his two daughters were also drunk, and that on account of such conduct the daughters were discharged. The truth of their testimony, however, was denied by Stuckey.

R. E. Oats and C. R. McFarland testified that they lived in Gordonville, Tex., for a number of years. during all of which time they were acquainted with W. F. Stuckey. Oats testified that Stuckey's reputation for truth and veracity was good; that he was highly respected; and that he was such a person as witness would trust to raise a little girl such as the one in controversy.

C. R. McFarland testified practically to the same effect, but further testified as follows:

"No, I can't say that his daughters are the same kind of characters as Mr. Stuckey; they are not. No, I can't say they are not, but Bob is not responsible for that. Yes, there has been quite a bit of talk in the town about the girls. Well, there was something about a man bringing an officer there to see about arresting one of them or something. That is all I know about it. Yes, I do remember something about them whipping a fellow, but I don't think they had to pay a fine; yes, there was a great deal of talk about that. That is all that I think of now. Yes, I do remember the occurrence of the son being killed. It was over a woman, I think; yes, it was. Yes, that makes several times that there has been a great deal of talk about the family. I suppose every one there knows of the conditions."

According to the uncontradicted testimony of the relator, his present wife, and several of his neighbors residing in Wichita Falls, relator is engaged in business in that city where he has a home, and is amply able to maintain and support his child.

C. L. McCray, one of the witnesses, testified as follows:

"I am a plumbing contractor. I know Mr. and Mrs. Ellis and the little girl. I know their home life—it is the best—they are happy, and Mr. Ellis provides for them in the best of fashion. The mother (meaning the present Mrs. Ellis) and the little girl seem to be very much attached to one another. Dan Ellis is a fine fellow as far as I know, and I have known him ever since he has been with the Union News Company, some 16 years. Yes, sir, he has from 3 to 15 men under him all of the time. I have been in their home, and it is the best. They all seem to get along as good as people can, and better than a lot I have seen. He is a fit person to have the control of his daughter, and he will and was raising her right."

Mrs. L. Summers testified in part as follows:

"I live with my brother Mr. Parrott; he is a witness in this case. We live close to the home of Mr. and Mrs. Ellis. I visit there several times a day; they have a wonderful little home, everything pleasant and happy. The child and Mrs. Ellis seem to be attached to one another. I know that Mrs. Ellis makes all of her clothes, and looks after her just like she does her own children, and is as sweet and kind to her as a mother would be to her own children. There could be no better place for this child than at home where she has been for the past two months. Yes, Mrs. Ellis takes her to Sunday School every Sunday, and she was in school at the time they came after her. I know that this is a fit and proper place for her, and that there could be no cleaner nor more decent, and pleasant, happy home than this one. Mr. Ellis certainly does provide well for his family—lots better than usual, I think."

Several others testified practically to the same effect, while Mrs. Ellis, relator's present wife, testified to the most affectionate regard for the child and of her earnest desire and willingness to care for her as she would her own child.

The trial judge denied relator the custody of the child, and awarded her custody to W. F. Stuckey, the grandparent referred to above.

We have carefully considered all of the testimony in the case, and have reached the conclusion that the custody of the child should have been awarded to the relator, who is her natural guardian, and who, according to all the evidence, is in no manner disqualified to have such custody, but who is in every respect the proper guardian of her person. The following authorities amply support that conclusion: Garner v. Bowles (Tex. Civ. App.) 233. S. W. 300. writ denied, and authorities there cited; State ex rel. Carouthers v. Dowdell (Tex. Civ. App.) 168 S. W. 2; State v. Deaton, 93 Tex. 243, 54 S. W. 901; Parker v. Wiggins (Tex. Civ. App.) 86 S. W. 788; Hall v. Whipple (Tex. Civ. App.) 145 S. W. 308.

Accordingly the judgment of the trial court is reversed, and judgment is here rendered awarding the custody of the minor, Modern Priscilla Ellis, to relator, D. I. Ellis. And this judgment will be certified to the court below, with instructions to the judge of the court to order the issuance of proper process to restore to relator the custody of said child.